ASSOCIATION OF PUBLIC–SAFETY COMMUNICATIONS OFFICIALS–INTERNATIONAL, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

UTAM, Inc., et al., Intervenors.

No. 95–1104.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 2, 1996.

Decided Feb. 16, 1996.

John Lane, Jr. argued the cause for petitioner, with whom Ramsey L. Woodworth and Robert M. Gurss, Washington, DC, were on the briefs.

James M. Carr, Counsel, Federal Communications Commission, argued the cause for respondents, with whom William E. Kennard, General Counsel, Daniel M. Armstrong, Associate General Counsel and John E. Ingle, Deputy Associate General Counsel, Washington, DC, were on the brief.

Ray M. Senkowski and Clifford M. Sloan were on the brief for intervenors UTAM, Inc. and Personal Communications Industry Association. Robert J. Butler, Washington, DC, Jim O. Llewellyn, Atlanta, GA, John F.

Beasley, Athens, GA, Lewis A. Tollin, Washington, DC, Michael D. Sullivan and William B. Barfield, Atlanta, GA, entered appearances.

Before: EDWARDS, Chief Judge, WALD and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Over the past several years, the Federal Communications Commission ("FCC" or "Commission") has attempted to devise a plan to allocate spectrum to promote the development of emerging wireless telecommunications technologies without unduly disrupting the services currently utilizing spectrum space. This case involves a challenge to one aspect of the Commission's allocation plan, which has set aside a specific portion of the spectrum for the new technologies, and provided rules for effectuating the relocation of many of the fixed microwave licensees currently occupying the reserved bands. In 1992, the Commission adopted a set of rules requiring current non-public-safety occupants of the newly-designated emerging technologies bands to relocate to other spectrum if an emerging technology licensee needed their current spectrum space, but exempting public safety organizations from this relocation requirement. The Association of Public–Safety Communications Officials ("APSCO") now seeks review of a *subsequent* order in which the FCC rescinded the public safety exemption, and thereby subjected public safety organizations, along with all the other fixed microwave licensees, to the risk of mandatory relocation.

Because we find that the Commission based its change in policy on reasoned decisionmaking supported by evidence in the record, we deny APSCO's petition for review.

## I. BACKGROUND

In an initial decision not challenged by the petitioners here, the Commission in 1992 proposed to set aside most of the 1850–2200 MHz frequency bands ("reserved bands") of the spectrum for the use of emerging technologies, including Personal Communications Services ("PCS").[1] The reserved bands, however, were already occupied by various fixed microwave licensees, including many public safety organizations. In order to make room in the reserved bands for the new services, the FCC proposed a program providing for the relocation of the current occupants of the band to fully comparable facilities on other spectrum.

In October 1992, the FCC adopted rules governing the transition of the reserved band from its current fixed microwave use to its new emerging technologies use. *See First Report & Order and Third Notice of Proposed Rulemaking,* 7 F.C.C.R. 6886 (1992) ("First Order"). In August 1993, the Commission adopted a new set of rules further clarifying the transition process established in the First Order. *See Third Report & Order and Memorandum Opinion & Order,* 8 F.C.C.R. 6589 (1993) ("Third Order").[2] Under the transition plan described in these two orders, a current fixed microwave occupant and a new emerging technology licensee would engage in voluntary negotiations for a set period of time,[3] after which the

---

1. PCS, a new form of public mobile service which encompasses a broad range of wireless radio communications services, makes up a significant portion of the current emerging technologies market. *Unlicensed* PCS apparently cannot operate successfully unless all other spectrum users relocate from the bands allocated for the new service. *Licensed* PCS, on the other hand, apparently can—to some extent—share spectrum space with others. The extent to which such spectrum-sharing will prove successful involves technical predictions central to this dispute.

2. The *Second Report & Order,* 8 F.C.C.R. 6495 (1993), is not relevant to this proceeding.

3. In its First Order, the Commission solicited comments on the appropriate length of the transition period the FCC should adopt. 7 F.C.C.R. at 6891. In its Third Order, the Commission adopted a transition plan that required an emerging technology licensee to engage in a two-year voluntary negotiation period with the fixed microwave service before instituting the one-year mandatory period. 8 F.C.C.R. at 6595.

Because of inherent differences between licensed and unlicensed PCS, however, the Commission only provided a one-year negotiation period for incumbent fixed microwave facilities operating in spectrum allocated for *unlicensed* devices. *Id.* at 6598.

new licensee could initiate a mandatory negotiation period culminating in the forced relocation of the current occupant to other spectrum. In order to force the microwave licensee to move, however, the new occupant would have to assume all costs for the move, and would have to build and test the comparable new facility. First Order, 7 F.C.C.R. at 6890.

Even though this transition plan contained stringent safeguards to protect the interests of *all* incumbent licensees, the FCC originally took the extra step of providing an exemption which shielded public safety services from any mandatory relocation. The public safety exemption incorporated in the first order, 7 F.C.C.R. at 6891, and reaffirmed in the third order, 8 F.C.C.R. at 6590, would have allowed the exempted facilities to continue operating indefinitely in the emerging technologies band on a co-primary, non-interference basis (meaning that each licensee was under an obligation to avoid interfering with the other). The FCC explained that the public safety exemption grew out of the Commission's hesitation to impose on public safety services "the economic and extraordinary procedural burdens, such as requirements for studies and multiple levels of approvals" that might accompany relocation. Third Order, F.C.C.R. at 6610.

In response to the Third Order, the FCC received nine petitions for reconsideration, which it addressed in a 1994 opinion. *Memorandum Opinion & Order,* 9 F.C.C.R.1943 (1994) ("Opinion" or "First Opinion"). In addition to addressing the petitions it received, the FCC, on its own motion, reconsidered the public safety exemption and ordered its repeal. *Id.* at 1947. Despite the decision to revoke the public safety exemption, the Commission reiterated its belief "that certain public safety entities warrant special consideration because previously they have been excluded from involuntary relocation and because of the sensitive nature of their communications." *Id.* at 1947–48. In place of the exemption, therefore, the new order established an extended negotiation period for public safety licensees consisting of a four-year voluntary negotiation period followed by a one-year mandatory negotiation. *Id.* at 1948.[4]

The opinion explains that this new plan accommodates the conflicting needs to clear the spectrum for emerging technologies and to protect the integrity of emergency services. In addition to the extended negotiation period, public safety licensees will enjoy the same safeguards available to all microwave licensees currently operating in the reserved bands: first, the emerging technology licensee must pay *all* costs associated with the incumbent's relocation (including engineering, equipment and site costs, FCC fees, and any reasonable additional costs); second, the relocation facilities must be fully comparable to the ones being replaced; third, the new licensee must complete all activities, including testing, necessary to operate the new system before relocation; and fourth, if the new facilities in practice prove not to be equivalent in every respect to the old ones, the public safety operation may relocate back to its original facilities within one year and remain there until complete equivalency (or better) is attained. *Id.* The Commission concluded that this policy "will not disadvantage incumbent public safety operations required to relocate," and will "ensure that essential safety of life and property communications services are not disrupted." *Id.*

Several groups, including APSCO, petitioned the Commission to reconsider the decision to eliminate the public safety exemption. The FCC addressed each of the petitioners' concerns in its Second Memorandum Opinion and Order denying the petition for reconsideration. *See Second Memorandum Opinion & Order,* 9 F.C.C.R. 7797 (1994) ("Second Opinion"). The Commission restated its position from the first opinion that the revocation of the exemption had resulted from the Commission's realization that it had previously underestimated the difficulty of spectrum-sharing and the problems that could result

---

4. In a later opinion, the Commission modified the negotiation period for public safety facilities by shortening the voluntary period to three years and extending the mandatory period to two years (maintaining a five-year cumulative period). *Second Memorandum Opinion & Order,* 9 F.C.C.R. 7797, 7802 (1994).

from a rule which allowed public safety operators to remain in the reserved bands indefinitely. *Id.* at 7797. The FCC reported that, based on information in the record, the Commission had ultimately determined that "it would be in the public interest to subject all incumbent facilities, including those used for public safety, to mandatory relocation if an emerging technology provider requires the spectrum used by the incumbent." *Id.*

APSCO now petitions this court for review of the FCC's revocation of the public safety exemption, arguing that the Commission's about-face on this issue was arbitrary and unreasonable, and did not rest upon a reasoned analysis of the record.

## II. Discussion

■ When an agency acts to rescind a standard it previously adopted, a reviewing court will subject that rescission to the same level of scrutiny applicable to the agency's original promulgation. *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 41, 103 S.Ct. 2856, 2865, 77 L.Ed.2d 443 (1983) (*"State Farm"*); *Telecommunications Research & Action Center v. FCC,* 800 F.2d 1181, 1184 (D.C.Cir.1986). But if the agency has offered a reasoned explanation for its choice between competing approaches supported by the record, the court is not free to substitute its judgment for that of the agency. *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 853 (D.C.Cir.1970) ("[W]here there is substantial evidence supporting each result it is the agency's choice that governs."). Thus, the petitioners here must do more than raise a doubt about the ultimate wisdom of the Commission's decision to repeal the public safety exemption; rather, APSCO must demonstrate that the revocation is unsupported by the record.

■ At the heart of petitioners' argument is the claim that the FCC's decision to revoke the public safety exemption did not rely on any new studies or technological data that had become available since the time of the initial rulemaking. Because the information available to the Commission in 1992 "did not require the relocation of all public safety

licensees," APSCO claims that "this old information similarly provided no basis for the Commission's abrupt change in policy" reflected in the 1994 opinions. Petitioners' Brief at 20. There is a fundamental flaw in APSCO's argument, however; petitioners' claim assumes that if the record does not *require* a certain result, neither can it *support* that result. The petitioners have misunderstood the Commission's burden. The FCC need not demonstrate that it has made the *only* acceptable decision, but rather that it has based its decision on a reasoned analysis supported by the evidence before the Commission. Particularly where, as here, an agency issues a regulation reflecting reasoned predictions about technical issues, logic suggests that the record may well contain evidence sufficient to support more than one possible outcome. *See, e.g., Greater Boston,* 444 F.2d at 853.

■ Thus we will affirm the FCC's order if we find that the Commission has offered a reasoned analysis for its ultimate decision to revoke the public safety exemption, and that the proffered analysis is supported by evidence in the record. After reviewing the record, we conclude that the Commission has adequately explained its change in policy, and therefore that its new policy deserves deference.

The Commission, in its second opinion, refers to specific studies in the record that support the decision to subject public safety providers, along with other fixed microwave licensees, to the possibility of forced relocation. Second Opinion, 9 F.C.C.R. at 7800. Specifically, the Commission cites studies submitted by Cox Enterprises, Inc. ("Cox"), and by American Personal Communications ("APC"), regarding spectrum congestion and its impact on the implementation of emerging technologies. *Id.* For example, the Commission points out that the Cox and APC studies showed that in certain major metropolitan areas, the public safety entities that would have enjoyed the original exemption constitute a large percentage of the incumbent services, and that in some of these cities, the deployment of PCS would likely be impossible if the exemption remained in

force. *See id.* at 7799, 7800. The second opinion also refers to two other comments received by the FCC (from American Mobile Satellite Corporation ("AMSC") and the Personal Communications Industry Association ("PCIA")) noting that the public safety exemption could render the allocated frequency inadequate for PCS deployment. *Id.* at 7799. Additionally, the Commission cites to comments submitted by Apple Computer, Inc. ("Apple"), and UTAM, Inc. ("UTAM"), concluding that "PCS and, especially, unlicensed nomadic PCS, cannot share spectrum with fixed microwave facilities." *Id.*

After reviewing the comments in the record supporting the change in policy, the Commission offered the following explanation of its rationale:

> In view of the evidence that the introduction of new communications services that will benefit the public could be precluded unless clear spectrum can be obtained, and that relocation can be accomplished reliably, we continue to believe that it is in the public interest to require all incumbents to relocate if their spectrum is required for new services using emerging technologies.

*Id.* at 7801. The FCC also noted that the new plan provides ample safeguards to ensure that public safety operations will not be curtailed by any forced relocation. *Id.* In fact, the provisions guaranteeing that no incumbent will be required to move until the new PCS licensee builds, tests, and assumes all costs for fully comparable facilities for the incumbent, renders debatable the petitioners' claim that public safety providers are significantly injured by the new policy. Although forced negotiation and relocation will undoubtedly generate considerable hassle for an unwilling incumbent, the Commission points out that the end result—brand new facilities fully paid for by a PCS licensee— will often leave the incumbent better off after relocation.[5]

Arguing further that the Commission has not adequately explained its rationale in this case, petitioners point out that in the past we have conditioned our deference to agency decisionmaking with the caveat that "if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute." Petitioners' Brief at 16 (citing *Greater Boston,* 444 F.2d at 852). APSCO alleges that the Commission must offer more than a "barebones incantation" of its conclusion, *id.* (citing *Action for Children's Television v. FCC,* 821 F.2d 741, 746 (D.C.Cir.1987) ("*ACT*")), and that in this case, the Commission has failed to do so.

In light of the Commission's reasoned explanation for its change in policy, supported by specific references to the record discussed above, petitioners' reliance on *ACT* misses the mark. In *ACT,* the FCC had attempted to explain its termination of commercialization guidelines for children's television merely by stating that the rescission of the guidelines was consistent with deregulation of the industry at large. However, the original guidelines had been expressly justified by a finding that the marketplace could not adequately function when children made up the audience, and the Commission had not attempted to explain its sudden affirmation of "what had theretofore been an unthinkable bureaucratic conclusion." 821 F.2d at 746. Moreover, we suggested in *ACT* that the

5. We note, as developed at oral argument, that the revocation of the initial exception may cause public safety organizations to suffer an additional injury that may *not* be cognizable by this court. Under the original program exempting public safety providers from forced relocation, the petitioners would likely have enjoyed substantial leverage in their voluntary negotiations with PCS providers. Any PCS licensee whose services can only operate in clear spectrum would be forced to pay extraordinary costs, or "rents," to the incumbent, since the PCS operator's license could be rendered virtually useless by an incumbent's refusal to relocate voluntarily. While the petitioners undoubtedly have a significant financial interest in protecting the ability to exact such payments, their loss of rent-seeking potential is hardly a cognizable injury for consideration either by the FCC or by this court since their place on the spectrum was originally derived from a grant from the government.

In fact, the Commission's reference to comments submitted by UTAM expressing concern that the exemption would allow public safety providers to exact payments above and beyond the actual cost of relocation, *see* First Opinion, 9 F.C.C.R. at 1947, adds further support to our finding that the Commission based its ultimate decision on evidence in the record.

FCC *could have* adequately justified its decision by finding, for example, "that present levels of children's programming are inadequate; that additional commercialization is necessary to provide greater diversity in children's programming; or that increased levels of children's television commercialization pose no threat to the public interest." *Id.*

In this case, to the contrary, the Commission has expressly found that "it is in the public interest to subject all incumbent ... fixed microwave facilities, including public safety licensees, to mandatory relocation" and that emerging technologies services "may be precluded or severely limited in some areas unless public safety licensees relocate." Second Opinion, 9 F.C.C.R. at 7799. Whether or not these conclusions reflect *unassailable* analysis on the part of the Commission, the FCC has adequately articulated a *reasoned* analysis based on studies and comments submitted during the rulemaking process.

■ As a final challenge, APSCO argues that the Commission's alleged failure to consider other, less drastic, alternatives to the exemption's repeal rendered the decision arbitrary and unreasonable. Petitioners' Brief at 27–28. As the Commission correctly notes, however, "the fact that there are other solutions to a problem is irrelevant provided that the option selected is not irrational." *Loyola University v. FCC,* 670 F.2d 1222, 1227 (D.C.Cir.1982). Additionally, the FCC in this case *did* clearly address the alternatives that had been raised during the comment periods. The opinion explains that the FCC considered and rejected the proposals that depended on spectrum-sharing between incumbent microwave services and new emerging technology services. The fact that the Commission might not have addressed and rejected every conceivable approach to the challenge of making room for emerging technologies does not render its decision invalid.

Because the FCC has adequately explained its determination that public safety services occupying the reserved bands of the spectrum should be subject to mandatory relocation provisions, we hereby deny AP-SCO's petition for review of the Commission's order.

*So ordered.*